**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| Taylor-Wharton International LLC, *et al.*,[1] | Case No. 15-12075 (BLS) (Joint Administration Pending) |
| Debtors. | |

**DECLARATION OF THOMAS DOHERTY IN SUPPORT OF DEBTORS'
CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS**

I, Thomas Doherty, do hereby declare, under penalty of perjury, that:

1.      I am the Chief Restructuring Officer ("CRO") of debtors-in-possession Taylor-Wharton International LLC ("TWI") and Taylor-Wharton Cryogenics LLC f/k/a TW Cryogenics LLC ("Cryogenics" and together with TWI, the "Debtors").  I have served in this position since July 20, 2015.

2.      As CRO, I am one of the officers of the Debtors responsible for devising and implementing the Debtors' business strategies and overseeing the Debtors' financial, operational, and other business affairs.  In my position as CRO, I have become familiar with the Debtors' day-to-day operations, business and financial affairs, and books and records.  Moreover, I am fully familiar with the Debtors' efforts leading up these chapter 11 filings and have been engaged in, *inter alia*, the development, negotiation and implementation of various strategic alternatives and initiatives designed to maximize the value of the Debtors' businesses.

3.      On October 7, 2015 (the "Petition Date"), the Debtors each filed voluntary petitions (the "Petitions") for relief under Chapter 11 of title 11 of the United States Code,

---

1      The Debtors are the following two entities (with the last four digits of their taxpayer ID nos. in parenthesis):  Taylor-Wharton International LLC (1577) and Taylor-Wharton Cryogenics LLC (1713).  The Debtors' corporate address is:  5600 Rowland Road, Minnetonka, MN 55343.

11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code") in an effort to preserve and maximize the value of their Chapter 11 estates.

4. The Debtors intend to operate their business and to manage their properties as debtors-in-possession under Sections 1107(a) and 1108 of the Bankruptcy Code.

5. I have been advised by counsel that this Court has jurisdiction over these cases pursuant to 28 U.S.C. §§ 157 and 1334. In addition, I have also been advised by counsel that venue of these cases is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409.

**Overview of the Debtors' Corporate Structure,
Businesses Operations, History and Capitalization**

**A. The Debtors' Current Businesses**

6. The Debtors in these cases are TWI, a Delaware limited liability holding company formed in 2007, and its wholly-owned operating subsidiary, Cryogenics. Cryogenics is a leading designer, engineer and manufacturer of cryogenic equipment designed to transport and store liquefied atmospheric and hydrocarbon gases. Cryogenics serves three different end markets through three business divisions: CryoIndustrial, CryoScience and CryoLNG. CryoIndustrial produces cryogenic equipment to store industrial gases, with products ranging from large, on-site storage tanks to mobile cylinders used to deliver gas to customers. CryoScience produces smaller cryogenic containers used for biological research and laboratory applications (e.g., preservation of stem cells, artificial insemination for animal breeding, etc.). CryoLNG was launched in 2012 in response to the expanding use of liquid natural gas and the potential for utilization of cryogenic manufacturing expertise in growing end-markets – its product offerings include liquid natural gas storage tanks for numerous applications, including bulk storage, fueling stations, marine and vehicle applications.

7.     Cryogenics has manufacturing operations in Theodore, Alabama and its wholly-owned non-debtor foreign subsidiaries have manufacturing operations in China, Malaysia, Slovakia, and maintain warehouses in Germany and Australia.

8.     Currently, the Debtors employ approximately 164 employees in the United States (collectively referred to as the "Employees").  The Debtors have the following general categories of Employees: (1) corporate support personnel that primarily work out of the Debtors' corporate office in Minnetonka, Minnesota; and (2) personnel who support the Debtors' manufacturing businesses at the Debtors' facility in Theodore, Alabama.  Approximately 96 employees at the Theodore facility are represented by the Local #441 Sheet Metal Workers International Association labor union.

**B.     Background Regarding the Debtors' Businesses and Prior Chapter 11 Cases**

9.     TWI originally owned five distinct subsidiary limited liability companies, each of which engaged in specific manufacturing operations in the field of gas technology (the "Operating Companies").  TWI acquired the Operating Companies in December, 2007 from Harsco Corporation ("Harsco").  At the time of the acquisition, the Operating Companies were the leading global manufacturers, refurbishers, and providers of propane and cryogenic tanks, high and low pressure cylinders, composite cylinders and valves and pressure gauges for gas applications.

10.     Of the five original distinct Operating Companies, on the date hereof, only Cryogenics remains.  Each of the other Operating Companies was sold over time to generate funds to support operating losses which had developed as a result of substantially decreased revenue attributable to the 2008 financial crisis, and to pay debt.  TWI continues to provide management and related financial services for Cryogenics and its former Operating Companies.

11.     The Debtors have previously filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code in the United States Bankruptcy Court for the District of Delaware, which cases were jointly administered as Case No. 09-14089 (BLS).  On May 26, 2010, this Court confirmed TWI's Joint Plan of Reorganization.  The Debtors previously exited from chapter 11 on June 16, 2010.  During the course of those prior bankruptcy cases, the debtors sold assets of certain Operating Companies pursuant to 11 U.S.C. § 363, and pursuant to the confirmed chapter 11 plan, effectuated a debt and equity restructuring of their remaining businesses.

**C.     The Debtors' Current Corporate Structure and Operations**

12.     Debtor TWI is a Delaware limited liability holding company and is a wholly-owned subsidiary of non-debtor Taylor Wharton Intermediate Holdings LLC.  TWI has two wholly owned subsidiaries:  Debtor Cryogenics and non-debtor Crossmont Holdings LLC.  Crossmont Holdings LLC has no operations and merely holds, through a wholly-owned subsidiary (Fremont Land LLC), a parcel of real estate of *de minimis* value.

13.     Cryogenics has a single United States operation in Theodore, Alabama.  Cryogenics is the direct or indirect parent of several foreign non-debtor subsidiaries (and one non-debtor Delaware limited liability holding company), as set forth in the organizational chart below.  These foreign non-debtor subsidiaries have manufacturing operations in China, Malaysia, Slovakia, and warehousing operations in Germany and Australia.



14.     Cryogenics and its subsidiaries engage principally in the manufacturing and distribution of cryogenic portable and bulk storage tanks.  These tanks are used for storing cryogenic liquids, providing economical solutions for transporting, storing and dispensing liquefied gasses, medical applications, beverage carbonation applications and other related storage and delivery solutions.  Customers for these products include liquid gas distribution and production companies, cryoscience equipment distributors, carbonation system retailers and distributors, and others engaged in the cryogenics business.

15.     Cryogenics has developed a line of small tanks used in the medical and scientific industries through its CryoScience division.  CryoScience tanks are highly engineered and much smaller than the tanks manufactured in Cryogenics' historical large tank business.  CryoScience tanks are manufactured along with Cryogenics' larger industrial tanks in its Theodore, Alabama

plant.  The manufacture of CryoScience tanks utilizes about 20% of the Theodore, Alabama plant.  The remainder of the Theodore plant is devoted to Cryogenics' large tank business.

16.     In the ordinary course of business, Cryogenics and certain of its foreign non-debtor affiliates engage in intercompany transactions for the purchase and sale of goods.  Specifically, in the ordinary course of business, Cryogenics sells finished goods to Taylor-Wharton Slovakia s.r.o. and Taylor-Wharton Pty. Ltd. (Australia) for resale.  Cryogenics also purchases liquid cylinders from Taylor-Wharton Malaysia Sdn. Bhd. and standard bulk tanks from Taylor-Wharton (Beijing) Cryogenics Eq. Co. Ltd.  All balances between Debtors and non-debtor affiliates are settled periodically through cash payments, after applying any applicable setoffs.  The Debtors' conduct these transactions with foreign non-debtor affiliates at arms' length.

**D.      Prepetition Capitalization**

17.     <u>Senior Debt</u>.  As of August 31, 2015, the Debtors have approximately $45 million[2] currently outstanding under a senior secured debt facility pursuant to a Second Amended and Restated Credit Agreement, dated as of May 24, 2013 (as amended, restated and supplemented from time to time, the "<u>Credit Agreement</u>"), by and among the Debtors, Antares Capital LP ("<u>Antares</u>"), as agent (the "<u>Agent</u>") and lender, and certain other lenders thereto from time to time.  The senior debt currently consists of: (a) Term Loan A with an aggregate outstanding principal amount of approximately $29.4 million accruing interest at 7.75% per annum, (b) Term Loan B with an aggregate outstanding principal amount of approximately $11 million accruing interest at 8% per annum, (c) Term Loan C as described in more detail below, (d) a Revolving Loan A facility with an aggregate outstanding principal amount of

---

2       Amount does not include Term Loan C, described in more detail below.

approximately $4.5 million accruing interest at 7.75% per annum, and (e) a Revolving Loan B facility with an aggregate outstanding principal amount of approximately $80,000 accruing interest at 7.75% per annum and $7.7 million of outstanding Letters of Credit accruing interest at 5.5% (which Letters of Credit are fully cash collateralized) (the "Senior Debt").

18.     The Senior Debt (other than the Term Loan C) matured by its terms on June 15, 2015 and has not been repaid.  As a result, all loan facilities (other than the Term Loan C) under the Credit Agreement and all accrued and unpaid interest thereon are due and payable in full. Furthermore, the Agent may accelerate all unpaid principal and all accrued and unpaid interest on the Term Loan C.  All of the Debtors' obligations to the Agent and the holders of the Senior Debt under the Credit Agreement are secured by liens on and security interests in substantially all of the now existing and hereafter acquired property of the Debtors.

19.     2014 Term Loan C.  On January 8, 2014, by way of an Amendment No. 2, the Credit Agreement was amended to authorize $10 million of additional loan commitments under a new tranche, Term Loan C (the "Term Loan C"), accruing interest at 10% per annum and having a maturity date of August 30, 2017.  Pursuant to a Junior Participation Agreement, junior lenders (other than Antares) purchased 100% of the participations in the Term Loan C.  Term Loan C was increased by an additional $5 million on November 14, 2014.  Term Loan C is administered by the Agent under the Credit Agreement and is likewise secured by liens on and security interests in substantially all of the now existing and hereafter acquired real and personal property of the Debtors.  However, Term Loan C is subordinate in all respects to the Senior Debt.  As of August 31, 2015, the aggregate outstanding balance under the Term Loan C is approximately $16.9 million.

20.    <u>PIK Notes</u>.  In connection with its emergence from chapter 11 in 2010, TWI obtained exit financing through, *inter alia,* the sale of paid-in-kind interest bearing notes in the principal amount of $12,000,000, accruing interest at 15% per annum (the "<u>2010 PIK Notes</u>") pursuant to a Note Purchase Agreement dated as of June 15, 2010 (as amended, restated and supplemented from time to time, the "<u>NPA</u>") by and among the Debtors, Antares (as successor to General Electric Capital Corporation) as collateral agent, and certain other purchasers party thereto from time to time.

21.    On August 30, 2012, via amendment to the NPA, TWI sold additional paid-in-kind interest bearing notes in the principal amount of $10,000,000, accruing interest at 12% per annum (the "<u>2012 PIK Notes</u>" and collectively with the 2010 PIK Notes, the "<u>PIK Notes</u>").

22.    The PIK Notes are secured by junior liens on substantially all of the Debtors' assets, subordinate to the Senior Debt and Term Loan C.  As of August 31, 2015, the aggregate outstanding balance under the PIK Notes is approximately $40 million.

**E.        Events Leading to the Debtors' Bankruptcy Filing**

23.    Upon emerging from chapter 11 in 2010, TWI worked to achieve profitability but was unable to do so.  TWI sold several of the Operating Companies to reduce debt.  Specifically, in May of 2013, substantially all of the assets of the American Welding & Tank LLC and TW Express LLC[3] businesses were sold.  More recently, in June of 2015, TWI sold its membership

---

3    American Welding & Tank LLC's businesses involved the design, manufacturing, repair, refurbishment and conversion of propane tanks for residential commercial, industrial and agricultural applications.  AWT's products included bulk steel above-ground and underground propane storage tanks as well as tanks designed for anhydrous ammonia.

interests in Sherwood Valve LLC.[4]   The proceeds of those sales were applied to reduce the Senior Debt.   Despite efforts to streamline the Debtors' businesses, infusion of new capital through the PIK Notes and the Term Loan C, and the sale of certain Operating Companies, the Debtors' businesses have been unable to achieve profitability.

24.     The Debtors' financial issues have been compounded by product liabilities.   In connection with the acquisition of the Operating Companies from Harsco, the Debtors assumed certain liabilities for products manufactured by Harsco prior to the closing of the sale.   In connection with their prior chapter 11 cases, the Debtors restructured their liabilities for products manufactured during Harsco's ownership.   Currently, TWI is obligated to indemnify Harsco for 100% of liability arising from products manufactured after the 2007 acquisition and 50% of liability for pre-acquisition manufactured products.   The Debtors maintain a product liability insurance program under which TWI retains a $3 million self-insured retention for each occurrence.

25.     As a result of these challenges facing its businesses, the Debtors have commenced these cases in order to preserve and maximize the value of their business for the benefit of stakeholders.

**F.     The Sale Process**

26.     As a result of extensive pre-petition marketing efforts by the Debtors and their advisors, the Debtors have received an offer (the "Stalking Horse Bid") to purchase the assets of the CryoScience business division for $24 million in cash and the assumption of certain liabilities from Haier Medical and Laboratory Products USA, Inc. (the "Stalking Horse Buyer").

---

4     Sherwood Valve LLC's businesses involved production of industrial gas valves, propane tank valves and regulators, air conditioning and refrigeration products and SCBA, life support, SCUBA and oxygen valves.

Contemporaneous herewith, the Debtors are filing a motion seeking approval of bid procedures (the "Bid Procedures") which will subject the Stalking Horse Bid to higher and better offers.

27.     It is the Debtors' intention to sell all of their remaining assets and businesses, including the CryoScience Business, Cryogenics' Theodore, Alabama plant, and the stock and/or assets of Cryogenics' foreign subsidiaries.  Accordingly, under the Bid Procedures, if approved by the Court, the Debtors intend to solicit bids for Cryogenics' U.S. assets and businesses as well as the assets and businesses of Cryogenics' foreign subsidiaries.

**G.     First Day Motions**

28.     I have formed opinions as to (a) the necessity of obtaining the relief sought by the Debtors in their first-day applications and motions described herein (collectively referred to as the "First Day Motions"), (b) the need for the Debtors to continue to effectively operate, (c) the deleterious efforts if the Debtors do not obtain the requested relief, and (d) the immediate and irreparable harm that the Debtors will be exposed to in the event that the Court does not approve the relief requested in the First Day Motions.  My opinions are based upon my first-hand experience as CRO for the Debtors, through my review of various materials and information, discussions with other executives and employees of the Debtors, and discussions with the Debtors' outside advisors.

29.     I am authorized to submit this Declaration on behalf of the Debtors in support of the Debtors' voluntary petitions and the First Day Motions.  I have reviewed each of the First Day Motions and believe, to the best of my knowledge and based upon my discussions with executives and employees of the Debtors, that the facts set forth in the voluntary petitions and the First Day Motions are true and correct.  Based upon the foregoing, if called to testify, I could and would, testify competently to the key facts set forth in each of the First Day Motions.

30.     I believe that the relief sought in the First Day Motions is necessary to minimize the adverse impact of the Debtors' transition into chapter 11 and will preserve and maximize the value of the Debtors' estates for the benefit of the Debtors' creditors.

31.     As described more fully below, the Debtors have carefully tailored the relief requested in the First Day Motions in consultation with their professionals to ensure that the Debtors' immediate operational needs are met and that the Debtors will not suffer any immediate and irreparable harm.  I personally participated in the analysis that led to the creation of the First Day Motions and believe, based upon my personal knowledge and experience, that the relief requested is narrowly tailored to address those issues that require urgent relief to sustain the Debtors' immediate operability.

### 1.     Debtors' Motion Pursuant to Bankruptcy Rule 1015 and Local Rule 1015-1 for Order Authorizing Joint Administration

32.     The Debtors believe that many of the motions, applications, hearings and orders that will arise in these Chapter 11 cases will jointly affect the Debtors (which are TWI, a holding company, and its sole operating entity, Cryogenics).  For this reason, the Debtors believe that the interests of their estates, their creditors and other parties in interest would be best served by the joint administration of these Chapter 11 cases.  Specifically, the Debtors request that the Court maintain one file and one docket for each of the chapter 11 cases under the case number assigned to TWI and also request that an entry be made on the docket of Cryogenics' chapter 11 case to reflect the joint administration of these Chapter 11 cases.

33.     The Debtors believe that joint administration will also significantly reduce the volume of paper that otherwise would be filed with the Clerk of this Court, render the completion of various administrative tasks less costly, and maximize efficiency.  Moreover, the Debtors believe that the relief requested by this motion will also simplify supervision of the

administrative aspects of these cases by the Office of the United States Trustee.  For these reasons, I believe, and the Debtors submit, that the relief requested in this motion is in the best interests of the Debtors, their estates and their creditors and should therefore be approved.

**2.      Debtors' Motion for Order Authorizing the Debtors to File (I) Consolidated List of Creditors and (II) Consolidated List of Debtors' Thirty (30) Largest Non-Insider Unsecured Creditors**

34.      The Debtors seek an order for the authorization to file a consolidated list of creditors and a consolidated list of the Debtors' thirty (30) largest unsecured creditors.  The Debtors have identified hundreds of entities to which notice of certain proceedings in these Chapter 11 cases must be provided.  The Debtors anticipate that such notices will comprise, without limitation, notice of:  (a) the filing of the Debtors' voluntary petitions under Chapter 11 of the Bankruptcy Code, (b) the initial meeting of the Debtors' creditors in accordance with Section 341 of the Bankruptcy Code, (c) applicable bar dates for filing of proofs of claims, and (d) any hearing on adequacy of a disclosure statement or confirmation of a chapter 11 plan (collectively, the "Notices").

35.      The Debtors presently maintain various computerized lists of the names and addresses of their respective creditors that are entitled to receive the Notices and other documents in these cases.  The Debtors believe that the information, as maintained in computer files (or those of their agents), may be consolidated and utilized efficiently to provide interested parties with the Notices and other similar documents.  Accordingly, by this Motion, the Debtors seek authority to file the lists on a consolidated basis, identifying their creditors and equity security holders in the format or formats currently maintained in the ordinary course of the Debtors' business.

36.      The Debtors also submit that a single consolidated list of their combined thirty (30) largest unsecured creditors in these cases would be more reflective of the body of unsecured

creditors that have the greatest stake in these cases.  Therefore, the Debtors respectfully request authorization to file a single consolidated list of their thirty (30) largest unsecured creditors in these cases.

37.     For the foregoing reasons, I believe, and the Debtors submit, that the relief requested in this motion is in the best interests of the Debtors, their estates and their creditors and should therefore be approved.

**3.     Debtors' Application Pursuant to 28 U.S.C. § 156(c), Fed. R. Bankr. P. 2002 and Del. Bankr. L.R. 2002-1(f) for Entry of an Order Authorizing the Employment and Retention of Logan & Company, Inc. as Claims and <u>Noticing Agent for the Clerk of the Court</u>**

38.     The Debtors have hundreds of creditors.  I believe that the most effective and efficient manner of notice creditors and parties in interest is for the Debtors to engage an independent third party, Logan & Company, Inc. (the "<u>Claims Agent</u>") to act as the Debtors' notice and claims agent.  The size of the Debtors' creditor body would most likely make it impracticable for the Clerk's Office of the Court to undertake the task of notice creditors and parties in interest in these chapter 11 cases, and administering the claims process.  Furthermore, I understand that Local Bankruptcy Rule 2002-1(f) requires the Debtors' to file the application given that there are over 200 creditors of the Debtors.

39.     Upon information and belief, the Claims Agent specializes in noticing and claims agent services in chapter 11 cases.  The Debtors chose the Claims Agent based on both its experience and the competitiveness of its fees (after solicitation of 3 proposals).  I believe that the Claims Agent is well qualified to serve the Debtors in these cases and their employment will provide the Debtors with efficient management of the claims, noticing and balloting processes in these cases leaving the Debtors' management and professionals to focus on preserving and maximizing the value of the Debtors' estate in these chapter 11 cases.

4.     **Motion for Interim and Final Orders Approving Debtor-In-Possession
       <u>Financing and Use of Cash Collateral</u>**

40.     To provide the liquidity necessary to ensure the proper administration of these

Cases, the Debtors have contemporaneously herewith filed a motion (the "<u>DIP Motion</u>")[5],

pursuant to sections 105, 361, 362, 363(b), 363(c)(2), 364(c)(l), 364(c)(2), 364(c)(3), 364(d)(l),

364(e), 365, 507 and 552 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, 6004 and 9014

of the Federal Rules of Bankruptcy Procedure, and Del. Bankr. L.R. 4001-2, for entry of a

proposed interim order (the "<u>Interim Order</u>") and a final order (the "<u>Final Order</u>") that, if

granted, will among other things:

    i.     authorize the Debtors to obtain senior secured priming and superpriority
       postpetition financing, which, if approved on a final basis, would consist of a
       revolving credit facility for up to $13,800,000 (the "<u>DIP Revolver Facility</u>"),
       including a letter of credit sub-facility (including Pre-Petition Letters of Credit (as
       defined in the DIP Credit Agreement)) for up to $7,700,000, (the "**DIP LC Sub-
       Facility**" and together with the DIP Revolver Facility and the Roll Up DIP
       Facility (as defined below), collectively, the "<u>DIP Facility</u>") pursuant to the terms
       of (x) an Interim Order, (y) that certain Senior Secured Priming and Superpriority
       Credit Agreement, dated as of October 7, 2015 (as the same may be amended,
       restated, supplemented, or otherwise modified from time to time in accordance
       with its terms, the "<u>DIP Credit Agreement</u>"), by and among the Borrowers, the
       DIP Guarantors, Antares Capital LP, as administrative agent and collateral agent
       (in such capacity, and as administrative agent and collateral agent under the Roll
       Up DIP Facility, collectively, the "<u>DIP Agent</u>"), and the other financial
       institutions party to the DIP Credit Agreement as "Lenders" thereunder to fund,
       among other things, ongoing working capital, general corporate expenditures and
       other financing needs of the Debtors and provide letters of credit for the account
       of any of the Debtors;

    ii.    approves the terms of, and authorizes the Debtors to execute and deliver, and
       perform under, the DIP Loan Documents and authorizes and directs the Debtors
       to perform such other and further acts as may be required in connection with the
       DIP Loan Documents and this Court's Orders;

    iii.   grants (x) to the DIP Agent, for the benefit of itself and the other DIP Secured

---

5     Capitalized terms not defined in this subsection shall have the meanings ascribed thereto in the
DIP Motion.

Parties, Liens on all of the DIP Collateral pursuant to sections 364(c)(2), 364(c)(3) and 364(d) of the Bankruptcy Code, including certain priming Liens as set forth in the DIP Loan Documents, and (y) to the DIP Secured Parties, pursuant to section 364(c)(1) of the Bankruptcy Code, superpriority administrative claims having recourse to all prepetition and postpetition property of the Debtors' estates;

iv.   authorizes the Debtors to use Cash Collateral;

v.   vacates the automatic stay imposed by section 362 of the Bankruptcy Code solely to the extent necessary to implement and effectuate the terms and provisions of the DIP Loan Documents and this Court's Orders;

vi.   authorizes the Borrowers at any time prior to the earlier of (i) October 20, 2015 and (ii) the entry of the Final Order to borrow under the DIP Facility in an aggregate outstanding principal amount that, when taken together with the aggregate face amount of letters of credit outstanding under the DIP LC Sub-Facility, will not exceed $11,300,000 (or such higher amount, not to exceed $12,000,000, to which the DIP Agent and the Debtors agree in their respective sole discretion), and authorizes the DIP Guarantors to unconditionally guaranty such obligations jointly and severally;

vii.   grants (x) the Prepetition First Lien Secured Parties the Prepetition First Lien Adequate Protection, which consists of, among other things, First Lien Adequate Protection Liens, First Lien Adequate Protection Superiority Claims (as defined below), the Roll Up DIP Facility and current payment of accrued and unpaid prepetition and postpetition interest at the default rate on the Prepetition First Lien Obligations (other than any postpetition interest accruing on the Prepetition First Lien Obligations in respect of Term Loan C) and reimbursable fees and expenses, and (y) the Prepetition Second Lien Secured Parties the Prepetition Second Lien Adequate Protection, which consists of, among other things, Second Lien Adequate Protection Liens, and Second Lien Adequate Protection Superpriority Claims;

viii.   schedules a final hearing on the DIP Motion to be held no later than October 20, 2015 to consider entry of a Final Order that grants all of the relief requested in the DIP Motion on a final basis;

ix.   waives, upon entry of the Final Order, certain rights of the Debtors to surcharge collateral pursuant to section 506(c) of the Bankruptcy Code; and

x.   provides for the immediate effectiveness of an Interim Order and waives any applicable stay (including under Bankruptcy Rule 6004) to permit such immediate effectiveness.

41.     Approval of the DIP Credit Agreement and the use of Cash Collateral will provide the Debtors with immediate and ongoing access to borrowing availability to pay their current and ongoing operating expenses, including postpetition wages and salaries and utility and vendor costs.   The inability to make such expenditures would (i) result in immediate and irreparable harm to the Debtors' businesses, (ii) deplete going concern value, and (iii) jeopardize the Debtors' ability to maximize value.   To the extent that the Debtors' available and projected Cash Collateral is insufficient to fund such expenditures, the credit provided under the DIP Credit Agreement is necessary to preserve and enhance the value of their estates for the benefit of all stakeholders.   Additionally, the availability of credit under the DIP Credit Agreement will provide confidence to the Debtors' vendors and will be viewed favorably by the Debtors' employees, thereby promoting a successful chapter 11 process.   Accordingly, the timely approval of the relief requested in the DIP Motion is imperative to prevent immediate and irreparable harm to the Debtors' businesses.

**5.      Debtors' Motion Pursuant to 11 U.S.C. §§ 105(a) and 345(b), Fed. R. Bankr. P. 2015, and Del. Bankr. L.R. 2015-2 for an Order (I) Authorizing and Approving Continued Use of Prepetition Cash Management System, (II) Authorizing Continued Use of Prepetition Bank Accounts and Business Forms, (III) Waiving the Requirements of 11 U.S.C. § 345(b) on an Interim Basis, and (IV) Allowing Banks to Continue to Setoff Ordinary Administrative Fees Against the Debtors' Bank Accounts**

42.     In the ordinary course of business, the Debtors utilize an integrated, centralized cash management system to collect funds, transfer them to a concentration account and disburse them, through other accounts, to pay operating expenses (the "Cash Management System").   The Debtors seek entry of an order of the Court (a) authorizing and approving the continued use of their existing Cash Management System, (b) authorizing the continued use of their existing bank accounts and business forms, (c) authorizing the continuation of ordinary course intercompany

transactions, and (d) waiving the requirements of Section 345(b) on an interim basis with respect to the Debtors' deposit practices.

> ### a.    Debtors' Cash Management System and Existing Bank Accounts

43.    In order to lessen the disruption caused by the bankruptcy filings and maximize the value of their estates in these Chapter 11 cases, it is vital to the Debtors that they maintain their existing cash management system (the "Cash Management System"), which utilizes five bank accounts maintained by the Debtors with PNC Bank, N.A. in the ordinary course of business and identified below (collectively, the "Bank Accounts").

| Financial Institution | Account # | Purpose |
|---|---|---|
| PNC Bank | 5004320426 | Concentration Account |
| PNC Bank | 1019818034 | Payroll |
| PNC Bank | 1019818026 | Accounts Payable |
| PNC Bank | 5004317702 | Cryogenics Lockbox |
| PNC Bank | 5004317737 | Sherwood Valve Lockbox |

44.    The Cash Management System is used for all cash management, including accounts payable, accounts receivable, and payroll, and works as follows:  (i) all receipts are deposited into the Debtors' concentration account (#5004320426) or the Cryogenics' lockbox account (#5004317702); (ii) all receipts deposited into the Cryogenics' lockbox account (#5004317702) are periodically swept to the Debtors' concentration account (#5004320426); (iii) funds needed for issued checks, ACH debits, and wire transfer debits are periodically transferred from the Debtors' concentration account (#5004320426) to the Debtors' accounts payable account (#1019818026); and (iv) funds needed for payroll are periodically transferred from the Debtors' concentration account (#5004320426) to the Debtors' payroll account (#1019818034).   I believe that granting the Debtors authority to continue using the Cash Management System will help facilitate a smooth transition into the Chapter 11 cases.

45.    The Debtors also currently maintain the Sherwood Valve lockbox account (#5004317737), but have requested that PNC Bank close that account.  Prior to the Petition Date, TWI sold all membership interests of its subsidiary Sherwood Valve, LLC ("Sherwood") pursuant to a Membership Interest Purchase Agreement.  Prior to such sale, all of Sherwood's receipts were deposited into the Sherwood lockbox account (#5004317737) and were periodically swept to the Debtors' concentration account (#5004320426).  Funds needed to pay Sherwood's accounts payable would be periodically transferred from the Debtors' concentration account (#5004320426) to the Debtors' accounts payable account (#1019818026), and the Debtors would then make payment of the same.

46.    In connection with the sale of Sherwood's membership interests, TWI and the buyer entered into that certain Transition Services Agreement to Membership Interest Purchase Agreement, dated as of June 18, 2015 (the "TSA"), pursuant to which TWI is paid $20,000 per month to perform certain transition services.  Pursuant to the TSA, TWI agreed to perform, among other transition services, certain post-closing "accounting and treasury support" services, whereby TWI agreed to (i) continue to receive and process Sherwood's cash receipts from the Sherwood lockbox account and (ii) process Sherwood's accounts payable during an agreed transition period.  Accordingly, subsequent to the closing of the sale, Sherwood's receipts have continued to be deposited into the Sherwood lockbox account (#5004317737) and continued to be periodically swept to the Debtors' concentration account (#5004320426).  Sherwood would periodically provide direction to TWI regarding the payment of Sherwood payables.  Upon receiving such direction, TWI would then process checks for payment of the Sherwood payables based upon those instructions and transfer required funds from the Debtors' concentration account (#5004320426) to the Debtors' accounts payable account (#1019818026).  On Monday

of each week, TWI and the buyer would reconcile the Sherwood lockbox receipts and Sherwood's payables paid by the Debtors, and a true-up payment would be made. The agreement described in this paragraph is referred to herein as the "<u>Sherwood Arrangement</u>."

47. As of the Petition Date, the Debtors have discontinued the Sherwood Arrangement and will not process any further payables on behalf of Sherwood. Furthermore, the Debtors have commenced the process of closing the Sherwood lockbox account with PNC Bank. However, the process is not yet completed and therefore it is possible that Sherwood funds may be held in the Sherwood lockbox account as of the Petition Date and that additional funds may be received by the Debtors into the Sherwood lockbox account post-petition. To the extent that this is the case, the Debtors seek to transfer those non-estate funds to Sherwood.

48. The Debtors seek a waiver of the U.S. Trustee requirement that their bank accounts be closed and that new post-petition bank accounts be opened. If enforced in these cases, such requirements would cause enormous disruption to the Debtors' businesses and would impair the Debtors' chapter 11 efforts. The Debtors' bank accounts comprise an established Cash Management System that the Debtors need to maintain to ensure smooth collections and disbursements in the ordinary course of their businesses. Therefore, to avoid delays in paying debts incurred post-petition, and to ensure as smooth a transition to Chapter 11 as possible, the Debtors should be permitted to continue to maintain the existing bank accounts and, if necessary, to open new accounts and close existing accounts in the normal course of business operations. Otherwise, transferring the bank accounts will be disruptive, time consuming and expensive.

49. The Debtors represent that if the relief requested is granted, they will implement appropriate mechanisms to ensure that no payments will be made on any debts incurred by them prior to the Petition Date, other than those authorized by this Court. To prevent the possible

inadvertent payment of pre-petition claims, except for those otherwise authorized by the Court, the Debtors will work closely with the banks participating in the Cash Management System to ensure appropriate procedures are in place to prevent checks and other items issued pre-petition from being honored absent this Court's approval.

### b. Debtors' Existing Business Forms

50.     The Debtors also request that they be authorized to continue to use all correspondence and business forms existing immediately before the Petition Date without reference to the Debtors' status as debtors-in-possession.   Parties doing business with the Debtors undoubtedly will be aware of the Debtors' status as debtors-in-possession as a result of the size and publicity surrounding these cases.   If the Debtors were required to change their preprinted correspondence and business forms, they would be forced to choose standard forms rather than the current forms with which the Debtors' employees, customers and vendors are familiar.   Such a change in operations would create a sense of disruption and potential confusion within the Debtors' organization and for the Debtors' employees, customers and vendors.   I believe that it would be costly and disruptive to cease using all existing forms and to purchase and begin using new stationary and business forms.   The Debtors respectfully submit that to do so would be unnecessary and that appropriate care can be taken to assure the proper use of the existing forms.

### c. Waiver of Section 345(b) Requirements on an Interim Basis

51.     The Debtors request that the Court waive the requirements of Section 345(b) on an interim basis and permit them to maintain their deposits in their accounts in accordance with their existing deposit practices until such time as the Debtors obtain this Court's approval to deviate from the guidelines imposed under Section 345(b) of the Bankruptcy Code on a final basis.   Given the complexity of the Debtors' Cash Management System and the relative security

of the Cash Management System, I believe that cause exists to grant an interim waiver of the requirements of Section 345(b) of the Bankruptcy Code for a period of sixty (60) days and that such waiver would be in the best interests of the Debtors and their estates.

> **6.    Debtors' Motion Pursuant to 11 U.S.C. §§ 105(a), 363 and 507(a) for an Order (I) Authorizing the Debtors in Their Discretion, to Pay Certain Prepetition Employee Wages, Compensation and Employee Benefits and Continue Payment of Wages, Compensation and Employee Benefits in the Ordinary Course of Business; and (II) Authorizing the Debtors' Banks and Other Financial Institutions to Process, Honor and Pay Certain Check Presented for Payment and to Honor Certain Fund Transfer Requests**

52.    The Debtors have filed a Motion for Authority to Pay Certain Pre-Petition Employee Wages, Compensation and Employee Benefits (the "Employee Wages and Benefits Motion"), which contains a detailed description of the compensation and benefits programs maintained by the Debtors.

53.    The continued loyalty of Debtors' 164 employees is imperative to the continued operation of the Debtors' businesses during these chapter 11 cases.  The employees perform a variety of critical functions in the Debtor's manufacturing facility in Theodore, AL as in its corporate headquarters in Minnetonka, MN.  If the relief requested in the Employee Wages and Benefits Motion is not granted, I believe that the morale of the Debtors' employees will suffer and the Debtors will risk losing a substantial portion of their current workforce.  This type of employee disruption would cause the Debtors significant financial hardship and disruption to the Debtors' chapter 11 cases.

54.    The skills and experience of the employees, their relationships with key parties to the Debtors' business, such as customers and vendors, and their knowledge of the Debtors' products and business are essential to the preservation of the value of the Debtors' estates and, thus, the ability of the Debtors to maximize their value in connection with going concern sales(s).  Any interruptions in payment of prepetition employee-related obligations will impose

hardship on the employees and is certain to jeopardize their continued performance during this critical time.

55.     To minimize the personal hardship that employees will suffer if prepetition employee-related obligations are not paid when due, and to maintain the employees' morale during this critical time, I believe that it is critical to pay and/or perform, as applicable, employee-related obligations as described in detail in the Employee Wages and Benefits Motion.

**7.      Debtors' Motion for Order Pursuant to Sections 105(a), 363(b), 541, and 507(a)(8) of the Bankruptcy Code Authorizing (a) Payment of Certain Prepetition Taxes, and (b) Financial Institutions to Process and Cash Checks and Transfers Related Thereto**

56.     In the ordinary course of their business, the Debtors are required to collect certain taxes, including sales and use taxes, from third-parties and hold them for a period of time before remitting them to the appropriate taxing authorities (the "Trust Fund Taxes").  In addition, certain taxing authorities are authorized under state law to collect certain unpaid business and occupation taxes directly from individual officers and directors of the Debtors (the "Business Taxes" and together with the Trust Fund Taxes and the penalties, interest or other such charges that may be assessed thereon, the "Taxes").  The Taxes are paid monthly, quarterly or annually to the respective taxing authorities, depending on the given Tax and the relevant taxing authority to which it is paid.

57.     The Debtors seek authority to pay any Taxes that were accrued prepetition but were not in fact paid or processed prepetition, or were paid prepetition in an amount less than is actually owed, or to the extent any such payments made prepetition were rejected, lost or otherwise not received in full by any taxing authority.  Further, there may be Taxes incurred or collected from sales and services provided prepetition that will come due shortly after the filing, which the Debtors seek authority to pay pursuant to this Motion.  Finally, to the extent that any

checks, drafts, deposits or transfers issued or initiated by the Debtors on account of prepetition Taxes have not cleared as of the Petition Date, the Debtors also seek an order directing banks and other financial institutions to honor and process such payments.

58.     Without this relief, some, if not all, of the taxing authorities may initiate an audit of the Debtors if the Taxes are not paid on time.  Such audits will unnecessarily divert the Debtors' attention away from the chapter 11 process and result in unnecessary expenses. Moreover, I understand that if the Debtors do not pay such amounts in a timely manner, the taxing authorities may attempt to suspend the Debtors' operations, file liens, seek to lift the automatic stay, seek payment from the Debtors' directors and officers and pursue other remedies that will irreparably and immediately harm the estates.  Additionally, I further understand that absent the relief requested herein, some states hold corporate officers personally liable for unpaid "trust fund" taxes, including sales and use taxes, in certain circumstances.  Moreover, I understand that to the extent that any such "trust fund" taxes remain unpaid by the Debtors, their officers could be subject to lawsuits or criminal prosecution during the pendency of these Chapter 11 cases.  Even the possibility of any such lawsuit or criminal prosecution would most certainly distract the Debtors and their officers from their efforts in these Chapter 11 cases.

59.     The Debtors estimate that outstanding prepetition liabilities owing to the various taxing authorities for Taxes will not exceed approximately $5,700 exclusive of any Taxes that may have been paid prior to Petition Date but had not cleared as of the Petition Date.

60.     Failure to pay the Taxes could have a materially adverse impact on the Debtors' ability to operate in the ordinary course of business and to maximize the value of the Debtors' estates in these chapter 11 cases.  Accordingly, I believe that it is necessary and in the best interests of the Debtors' estates, creditors, and other parties in interests for the Debtors to

pay, in their sole discretion, the Taxes, including any penalties and interest thereon, if any, and any liability resulting from audits of pre-petition Taxes to the relevant taxing authorities in the ordinary course of the Debtors' businesses.

**8.**     **Motion of Debtors Pursuant to 11 U.S.C. §§ 105(a) and 366 for Interim and Final Order Finding Utilities Adequately Assured of Payment and Establishing Further Procedures**

61.     In the ordinary course of business, the Debtors regularly incur utility expenses for water, sewer, electricity, gas, local and long-distance telephone service, cellular phone service, internet service, and other utility services.  Approximately 24 utility providers (as such term is used in section 366 of the Bankruptcy Code, the "Utility Providers") provide these services.  A complete list of the Utility Providers is attached as Exhibit A to the Utilities Motion (the "Utility Service List").  The approximate monthly charges for the utility services provided by the Utility Providers totals $250,000.  The provision of utility service by the Utility Providers is governed, in some instances, by applicable federal or state tariffs, and by service agreements.

62.     Prior to the Petition Date, the Debtors had a history of timely payment of utility costs.  The Debtors are not currently aware of any past due amounts.  However, due to the timing of the filings in relationship to the Utility Providers' billing cycles, the Debtors are aware of utility costs that have been invoiced to the Debtors for which payment is not yet due and utility costs for services provided since the end of the last billing cycle that have not been invoiced to the Debtors.  The Debtors are not seeking authority to pay any outstanding prepetition amounts.

63.     Given the number of Utility Providers from which the Debtors receive services, I understand, based on the advice of counsel, that procedures are necessary to deal with the adequate assurance requirements of section 366 of the Bankruptcy Code and to avoid any interruption of the utility services provided to the Debtors.  I believe that the proposed

procedures are necessary because if such procedures are not approve, the Debtors could be forced to address numerous requests by the Utility Providers in a disorganized manner during the critical first weeks of the chapter 11 cases.  Moreover, uninterrupted utility services are essential to the Debtors' ongoing operations and, therefore, to the success of these chapter 11 cases. Accordingly, on behalf of the Debtors, I respectfully submit that the Utilities Motion should be approved.

9.    **Debtors' Motion for an Order (I) Authorizing the Debtors to Pay Certain Prepetition Claims Held by the Debtors' Warehousemen and Freight Carriers; and (II) Granting Related Relief**

64.    In connection with the day-to-day operation of their business, the Debtors rely on several freight and transportation companies operated by third parties to transport the Debtors' products.  Additionally, certain products are stored in third-party warehouses prior to or during transit.  As a result, warehousemen and freight carriers have possession of certain of the Debtors' products in the ordinary course of business, which may give rise to possessory liens arising under state law.  The Debtor utilizes the services of a third-party service provider, Franklin Global Logistics, Inc. ("Franklin"), to audit the Shippers' invoices and approve the invoices for payment on the Debtor's behalf.

65.    It is essential to the Debtors' businesses that they maintain a reliable and efficient supply of products for sale to customers.  If the Debtors fail to pay the claims of the freight carriers and warehouseman (collectively, the "Warehouse and Freight-Related Claims"), the Debtors believe that many of the Freight Carriers or the Warehouseman may stop providing essential services to the Debtors.  Delays in receiving products would cause major disruptions to the Debtors' operations and damage the Debtors' businesses.  Even if suitable alternatives for warehouse and freight-related services were available, the time necessary to identify these

replacements and integrate them into the Debtors' operations likely would cause significant disruption.

66.    As a result of the foregoing, the Debtors seek entry of an order authorizing them to pay the undisputed amounts owed by the Debtors on account of outstanding Warehouse and Freight-Related Claims.  Since the amounts owed to warehousemen and freight carriers who have lien rights likely are less than the value of any property securing their claims, such parties are likely fully secured creditors and the payment of their prepetition claims will give them no more than that to which they will likely be entitled to receive in the Debtors' bankruptcy cases.

> **10.    Debtors' Motion Pursuant to Sections 105 and 363 of the Bankruptcy Code for an Order Authorizing the Payment of Certain Pre-petition Claims of Certain Critical Vendors**

67.    The Debtors seek entry of an order authorizing the Debtors, in their sole discretion, to pay certain prepetition claims (the "Critical Vendor Claims") of certain critical vendors and service providers (the "Critical Vendors") that are essential to the Debtors' business operations, in an aggregate amount not to exceed $2 million (the "Critical Vendor Cap").  The immediate payment of the Critical Vendor Claims is not only critical to the Debtors' chapter 11 sale efforts, but immediately necessary in light of the industry in which the Debtors operate.

68.    The Critical Vendors generally consist of the parties that supply, either directly or as a distributor, steel, machine parts, valves, pipe, and other parts related to the manufacturing of the Debtors' products.  Critical Vendors also include maintenance, repair, and operations providers and other service providers that render vital services to all of the Debtors' business locations.

69.    The Critical Vendors are generally "sole-source" suppliers that are absolutely essential to the Debtors' ability to operate the Business.  The failure to pay the Critical Vendor Claims would result in the Critical Vendors refusing to provide goods or services to the Debtors

post-petition which could have an immediately devastating effect on the Debtors' ability to operate their businesses.  Moreover, the delay attendant to the Debtors changing from a Critical Vendor to another vendor of similar products or services (assuming one could be located) would very likely delay the Debtors' ability to operate their businesses, which would have a severely negative impact on Debtors' operations.

70.    The Debtors and their advisors have examined and continue to examine whether the payment of Critical Vendor Claims is necessary, will ameliorate immediate and irreparable harm to the Debtors' business operations, and will ensure that the Debtors have access to adequate trade credit post-petition.  Specifically, the Debtors have undertaken a thorough review of their accounts payable and their list of prepetition vendors to identify those vendors who are essential to the Debtors' operations.

71.    In determining an estimate of the Critical Vendor Claims, the Debtors have conducted an analysis to identify the vendors that are most essential to the Debtors' operations using the following criteria: (a) whether the vendor in question is a "sole-source" or "limited source" provider, (b) whether the Debtors receive advantageous pricing or other terms from a vendor such that replacing the vendor post-petition would result in significantly higher costs to the Debtors and/or inadequate or unsatisfactory services, and (c) the overall impact on the Debtors' operations if the particular Critical Vendor ceased or delayed shipments or services.

72.    After conducting this analysis, the Debtors estimated the total payments that would be necessary to ensure the continued supply of critical goods and services to the Debtors and, further, considered the Debtors' urgent need to continue to receive goods and services uninterrupted, their ability to find alternate sources, or satisfactory alternate services, and the

likelihood that a vendor would extend trade terms post-petition despite the Debtors' failure to pay such vendors pre-petition outstanding trade debt.

73.     If the Debtors are unable to pay their Critical Vendors and those vendors cease or delay delivery of those products or services, the Debtors would be extremely disadvantaged in a highly competitive market segment and would suffer an immediate erosion in customer, creditor and employee trust and confidence which would be difficult, if not impossible, to restore. Therefore, I believe that the granting authorization to the Debtors, in their sole discretion, to pay Critical Vendor Claims that are essential to the Debtors' business operations is in the best interests of the Debtors estates, their creditors, and all other parties in interest.

**11.     Debtors' Motion to Schedule Bidding Procedures Hearing on Shortened Notice**

74.     The Debtors' success in these cases depends upon promptly pursuing a sale of the Debtors' remaining business and assets.

75.     On the Petition Date, the Debtors filed the Debtors' Motion Pursuant to 11 U.S.C. §§ 105(A), 363, 365 and Fed. R. Bankr. P. 2002, 6004, 6006 for (A) Order (I) Establishing Sale Procedures Relating to the Sale of (1) the Debtors' CryoScience Business and (2) Any or All of the Debtors' Assets; (II) Approving Bid Protections in Connection with the Sale of the Debtors' CryoScience Business; (III) Establishing Procedures Relating to the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, Including Notice of Proposed Cure Amounts; (IV) Approving Form and Manner of Notice of All Procedures, Protections, Schedules, and Agreements; (V) Scheduling a Hearing to Consider the Proposed Sales; and (VI) Granting Certain Related Relief and (B) an Order (I) Authorizing the Sale of the Debtors' Assets Free and Clear of All Liens, Claims, Encumbrances, and Interests; (II) Authorizing the

Assumption and Assignment of Certain Executory Contracts and Unexpired Leases; and (III) Granting Certain Related Relief (the "Sale Motion").

76.     The Debtors are requesting that the Court schedule a hearing on the approval of the Debtors' proposed Bid Procedures on shortened notice.  I believe that shortened notice is critical for several reasons.

77.     First, as set forth above, the Senior Debt (other than the Term Loan C) matured by its terms on June 15, 2015 and has not been repaid.  As a result, all loan facilities (other than the Term Loan C) under the Credit Agreement and all accrued and unpaid interest thereon are due and payable.  The Debtor has not been able to obtain replacement financing apart from the DIP Facility, which requires the Debtors to obtain entry of an Order approving the Bid Procedures by no later than October 20, 2015.

78.     Additionally, the Debtors' product liability and other insurance coverage expires on December 7, 2015, at which time it would be necessary for the Debtors to make substantial premium payments to continue to its insurance program or obtain replacement insurance.  The Debtors estimate that the total insurance premiums would approximate $3 million or more.  The Debtors currently do not have the access to cash or financing in order to secure new insurance policies.  Furthermore, there is a material risk that the Debtors may not be able to obtain replacement insurance, even if financing was available to the Debtors.  The potential for discontinuation of insurance coverage poses a severe threat to the Debtors' businesses, necessitating the timeline for the sale being proposed in these cases.

79.     Shortened notice of the hearing on Bid Procedures is also appropriate given the Debtors' prepetition marketing efforts.  The Debtors extensively marketed the CryoScience Business beginning in December 2014.  In January 2015, the Debtors expanded their marketing

efforts to include all their businesses and Assets. As part of this process, the Debtors hired an investment banker who contacted numerous parties who were likely to be interested in the Debtors' Assets and businesses. This process included distribution of a 58 page marketing package for the CryoScience Business (supplemented by an additional 24 page package for all of the Debtors' Assets) to approximately 33 parties. Such process resulted in indications of interest by at least 10 parties. The fact that the Debtors' Assets were for sale was of general knowledge in the Gaserv industry. Upon execution of a confidentiality agreement, each interested party was given access to a data room established by the Debtors to facilitate due diligence. In addition to the Stalking Horse Buyer, the Debtors believe that several other potential purchasers remain interested in purchasing some or all of the Debtors' businesses and assets. Some of those expressions of interest include the CryoScience Business, other of those expressions of interests exclude the CryoScience Business. Accordingly, a timely sale process in essential to retain this interest and maximize the value of the Debtors' businesses.

80.     Shortened notice is also required to comply with the terms of the Debtors' Stalking Horse Bid and to preserve the Stalking Horse Bid, which requires that the court enter an Order approving the Bid Procedures by October 20, 1015.

81.     Furthermore, I believe that shortened notice of the Bid Procedures is necessary as a first step in establishing the timeline for the auction and sale process. As set forth elsewhere in this affidavit, the Debtors are highly reliant upon their employees, as well at their suppliers and vendors (certain of which have tightened or restricted credit terms). An established sale process is extremely important in promoting certainly among these parties and ensuring the preservation of the value of the Debtors' businesses.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: October 7, 2015

By: _____
Thomas Doherty
Chief Restructuring Officer