**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>TAYLOR-WHARTON INTERNATIONAL LLC, *et al.*,<br><br>Debtors. | Chapter 11<br><br>Case No. 15-12075 (BLS)<br><br>(Jointly Administered)<br><br>Re: Docket Nos. 909, 975, 985, & 1057 |


Patrick A. Jackson, Esquire
Drinker Biddle & Reath LLP
222 Delaware Avenue, Suite 1410
Wilmington, DE 19801-1621

*Counsel for Movant*

Derek J. Baker, Esquire
Reed Smith LLP
Three Logan Square
1717 Arch Street, Suite 3100
Philadelphia, PA 19103

Emily K. Devan, Esquire
Reed Smith LLP
1201 Market Street, Suite 1500
Wilmington, DE 19801

*Counsel for Debtors*

## OPINION[1]

Before the Court is the Motion filed by Worthington Cryogenics, LLC, *et al.* ("Worthington") for allowance and payment of an administrative expense (the "Motion") in the amount of $547,504 [Docket No. 909]. Taylor-Wharton International LLC and its affiliated debtors (collectively the "Debtors") oppose the Motion [Docket No. 985]. For the reasons stated below, the Court will deny the Motion.

## BACKGROUND

The Debtors were a leading designer, engineer and manufacturer of cryogenic equipment designed to transport and store liquefied atmospheric and hydrocarbon gases prior to their bankruptcy filing. In its CryoScience division, the Debtors produced small cryogenic containers used for biological research and laboratory applications. On November 23, 2015, the Court approved an Asset Purchase Agreement (the "APA") and authorized the sale of the Debtors' CryoScience business to Worthington (the "Worthington Sale") [Docket No. 267]. The Worthington Sale closed on December 7, 2015.

The APA provided a timeline for determination of net working capital in the period leading up to and following the Worthington Sale. *See* APA § 1.6, Docket No. 985-1 at 9. At closing, the Estimated Closing Net Working Capital (the "Estimated NWC") was to be calculated and provided by the Debtors. *Id*. § 1.6(e) at 9-10. The Debtors' books and records related to the CryoScience unit were to be transferred to Worthington, who was subsequently responsible for the calculation of Final Closing Net Working Capital (the "Final NWC") within 90 days of closing. *Id*. § 1.6(f) at 10. Finally, in the absence of agreement between Worthington and the Debtors as to the final numbers, the APA provided for a dispute resolution process

[1] This Opinion constitutes the Court's findings of fact and conclusions of law, as required by the Federal Rules of Bankruptcy Procedure. *See* Fed. R. Bankr. P. 7052, 9014(c).

involving submission of competing calculations and supporting documentation and resolution by an independent consultant post-closing. *Id*. § 1.6(g)(iv)-(viii) at 11-12. Worthington had a 12-month window within which representations and warranties were challengeable. *Id*. § 9.6(a) at 44.

The record reflects that the Estimated NWC calculation was provided by the Debtors to Worthington at the closing. The Final NWC was thereafter provided by Worthington to the Debtors on March 3, 2016. The parties reached a reconciliation of the Final NWC on April 27, 2016 after negotiation between company personnel on both sides. The current dispute arose after that reconciliation as a result of alleged improper double-counted deposit account and buyer-paid accounts payable credits in the approximate amount of $503,489 that were integrated into the books and records provided to Worthington from the Debtors at closing. On October 4, 2016 (nearly a year after closing and five months after final resolution of the net working capital calculation), the discrepancy was discovered. Worthington subsequently filed its claim against the Debtors.

**JURISDICTION AND VENUE**

The Court has jurisdiction over this matter under 28 U.S.C. §§ 1334 and 157(b)(1). Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409. Consideration of the Motion constitutes a core proceeding under 28 U.S.C. § 157(b)(2)(A), (B) and (O).

**DISCUSSION**

**A. The Parties' Positions**

Worthington asserts that the agreed-upon calculation of the Final NWC resulted in an account overstatement of $503,489. Worthington primarily argues that reformation of the contract is proper under a theory of mutual mistake because the Debtors made errors related to

the numbers used to calculate the Final NWC. As a separate issue, Worthington argues that Taylor-Wharton Australia ("TW Australia")[2] breached the Asset Purchase Agreement with Worthington by withholding $44,015 in accounts receivable collections that it claims should have been paid over to Worthington.

In sum, Worthington's Motion requests a total of $547,504. This amount comprised: (i) $275,412 on account of the Buyer-Paid Accounts Payable issue, (ii) $228,077 on account of the Double-Counted Deposits issue, and (iii) $44,015 on account of the Australian Accounts Receivable issue. Worthington alleges that $275,411 of accounts payable, which had been included in the preliminary accounts payable report and paid by the buyer, were removed from the sub-ledger relied upon in calculation of the Final NWC. This resulted in an understatement of the purchase price adjustment in the Seller's favor by $275,411. Worthington further alleges that $228,077 of contra-liabilities had been duplicated as prepaid liabilities on the sub-ledger maintained by the debtors. This resulted in an additional understatement by $228,077. Finally, as noted above, Worthington alleges that TW Australia failed to remit to Worthington certain accounts receivable collections it contends were due under the APA.

The Debtors respond that there is no evidence in the record that establishes an error in the numbers provided by a specific party. The Debtors allege that Worthington never provided any of the backup data supporting an account overstatement. The Debtors further contend that Worthington has failed to carry its burden to show, by clear and convincing evidence, proof of a mutual mistake. The Debtors argue that if there was an error in the inputs for NWC, Worthington's pre- and post- closing opportunity for due diligence should have caught any such error. Finally, the Debtors argue that they are not a party to the TW Australia Distribution

[2] Taylor-Wharton Australia is a subsidiary of the Debtors.

Agreement that Worthington is alleging was violated and are not otherwise responsible for the debts of TW Australia.

## I. Net Working Capital Adjustment

Under a theory of mutual mistake, Worthington argues that the appropriate remedy is contract reformation. Case law teaches that the appropriate standard under which to evaluate a mutual mistake depends on the nature of the evidence as well as whether the parties are sophisticated professionals:

> A mutual mistake occurs when both parties to a contract share the same mistake at the time of its execution. Proving a mutual mistake requires evidence 'so convincing that it [leaves] no reasonable doubt' that the mistake occurred. A finding of mutual mistake is **heavily disfavored** where both parties are sophisticated professionals that were fully informed of the terms of the agreement.
>
> When an agreement is ambiguous, the clear language of the written instrument is considered the parties' express intent, and only extraordinary circumstances permit a court to disregard it. The Court may observe extrinsic evidence of the parties' contemporaneous and subsequent conduct to determine whether an agreement is the product of mutual mistake.

*In re Wash. Mut., Inc.*, No. 08-12229, 2018 Bankr. LEXIS 291, at *14-15 (Bankr. D. Del. Feb. 2, 2018) (internal citations omitted) (emphasis added). The Court notes that both the Debtors and Worthington are sophisticated parties and were represented by able and experienced professionals throughout the sale process.

Here, Worthington is alleging that a mutual mistake occurred because both parties were unaware of any computational error in the appraisal figures, which were used as the basis for the resolution of net working capital. Worthington states that neither it nor the Debtors were aware of any omission of buyer-paid accounts payable from, and the inclusion of the double-counted deposits on, the accounts payable aging used by Worthington in calculating the Final NWC.

Worthington claims that the omissions and inclusions were the result of errors by the Debtors, which were relied upon by both parties in reaching a settlement of the Final NWC.

As noted, the APA provided for a process by which the Debtors and Worthington were to resolve net working capital on an estimated and final basis. Five days prior to closing, the Debtors were to provide the Estimated NWC Statement and the relevant subledgers supporting the statement. The record reflects that the Debtors timely complied with this contractual obligation prior to closing. After closing, Worthington assumed control of the Debtors' books and records pursuant to the APA. Worthington was required to deliver the Final NWC Statement confirming the closing net working capital as of the closing date, and to provide reasonable supporting documentation within 90 days of closing. Worthington did so and its Final NWC differed materially from the Debtors' Estimated NWC. The record reflects that the final account reconciliation agreed upon between the parties was in the amount of $771,024, which was promptly paid from the escrow account after the parties reached a deal.

The APA thus established timelines by which the parties were to complete estimated and final statements. The burden for the former was on the Debtors (the sellers) while the latter was the responsibility of Worthington (the buyer). After closing, Worthington had 90 days to analyze the Debtors' calculations and prepare the Final NWC, and to scrub the numbers provided by the Debtors at closing. Worthington's complaints of a computational error – that could have been discovered in the 90-day time frame within which they had access to all books and records of the Debtors' CryoScience division – are unavailing.

The record reflects uncertainty at best as to whether any computational error was made by Debtors in the numbers provided to Worthington to calculate the Final NWC. In fact, the record reflects that the numbers used in calculating the Final NWC were open to negotiation and

were challenged in some instances by relevant agents of the parties.[3] The parties followed the time-line and protocol outlined by the APA, which resulted in post-closing adjustments and a final calculation provided by Worthington. When the final post-closing adjustment was made and agreed to, it effectively ended the period during which Worthington could challenge the sale under the APA. While representations and warranties could still be challenged for 12 months, there is no evidence on the record that suggest a representation or warranty was violated. Rather, Worthington simply emphasizes its theory of mutual mistake, which is not one governed by the APA. Sophisticated parties, such as the Debtors and Worthington, understand the importance of performing due diligence and the Court is loath to reform a contract in order to remedy inattention to detail.

Finally, even if the Court finds that some evidence may indicate the presence of an alleged computational error, Worthington has not presented evidence sufficient to meet the standard for clear and convincing evidence:

> Clear and convincing evidence is that weight of proof which produces in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established, evidence 'so clear, direct and weighty and convincing as to enable the [fact finder] to come to a clear conviction, without hesitancy, of the truth of the precise facts in issue.'

*In re Ellis*, 339 B.R. 136, 141-42 (Bankr. E.D.Pa. 2006) (citing *U.S. Fire Ins. Co. v. Royal Ins. Co.*, 759 F.2d 306, 309 (3d Cir. 1985)). At bottom, a finding of mutual mistake is heavily disfavored with sophisticated parties (such as Worthington and the Debtors). *In re Wash. Mut., Inc.*, No. 08-12229, 2018 Bankr. LEXIS 291, at *14-15 (Bankr. D. Del. Feb.

[3] *See* Trial Transcript at 92 ("Jeanne and I exchanged a lot of emails, some additional schedules that, quite frankly, I was lacking and didn't – have for my information when I prepared my version. So there was just some back-and-forth explaining the differences, and we ended up settling and coming to an agreement on a final-final net working-capital number.").

2, 2018) ("A finding of mutual mistake is heavily disfavored where both parties are sophisticated professionals that were fully informed of the terms of the agreement."). The circumstances surrounding a computational error are ambiguous enough for the Court to state unequivocally that Worthington has not met the high evidentiary requirements of the clear and convincing standard. *See id.*

**II. Australian Accounts Receivable**

The Court finds that the TW Australia dispute does not relate to the APA between the Debtors and Worthington. Although Worthington alleges that the claim related to the Australian accounts receivable resulted from a breach of a representation in the Worthington APA, the record fails to establish what, if any, representations, warranties or covenants were breached. Nothing in the record indicates that Worthington may not file a direct suit against TW Australia. Worthington may pursue its claim against TW Australia, but it has not demonstrated that these Debtors are liable to make good on any alleged shortfall from TW Australia.

## CONCLUSION

This Court finds that Worthington has failed to carry its burden in demonstrating that its claim should be allowed as an administrative expense. The Motion for Allowance of an Administrative Expense is denied. An appropriate Order will issue.

By the Court:

Dated: April 12, 2018
Wilmington, Delaware

BRENDAN LINEHAN SHANNON
CHIEF UNITED STATES BANKRUPTCY JUDGE